[No. 13225.  *En Banc.*  June 8, 1917.]

GRANT REALTY COMPANY *et al.*, *Appellants*, v. HAM,
YEARSLEY & RYRIE *et al.*, *Respondents.*[1]

WATERS AND WATER COURSES—APPROPRIATION FOR IRRIGATION—GOOD
FAITH—EVIDENCE.  Where an extensive irrigation project was in-
herently speculative in character, want of good faith in instituting
condemnation proceedings is not established by the fact that plain-
tiff was without means to purchase the land to be irrigated, and
testified that he supposed he was "selling out" in negotiating with
men of wealth to finance the project, where he did not mean that
literally and expected to retain an interest.

SAME—APPROPRIATION—GOOD FAITH—JUDGMENT IN CONDEMNATION
—CONCLUSIVENESS.  An order permitting a condemnation for an ex-
tensive irrigation project is conclusive upon the question of plaintiffs'
good faith up to the time of the judgment, as against the defendants
in the condemnation proceedings and subsequent grantees.

SAME—APPROPRIATION—DILIGENCE—EVIDENCE—STATUTES.  In con-
demnation proceedings to acquire a dam site and right of way for
the irrigation of nonriparian lands by the diversion of the waters
of a lake appropriated under Rem. Code, §§ 6318 and 6319, the time
reasonably consumed in the condemnation suit, which was resisted
by subsequent appropriators and riparian owners, must be con-
strued as time necessarily consumed in the performance of the
work of construction, in determining the question of plaintiffs' dili-
gence and whether his rights will relate back to the time of his
appropriation, under §§ 6318, 6319, which provide that the appro-
priator must commence construction of the works within three
months, and excavation and diversion within six months and must
diligently and continuously prosecute the same to completion, and
that by a strict compliance with such rules, his right to the use of
the waters relates back to the time the notice of appropriation was
posted; in view of the statutes *in pari materia*, § 6316, providing
that, as between appropriators, "the first in time is the first in
right," and § 6329 giving the nonriparian owner the right to con-
demn land for ditches and works necessary to divert the water to
his lands.

SAME.  In such a case, it cannot be claimed that diligence re-
quired the plaintiff to complete its ditches, flumes and pipes, which
would cost $595,000, before it constructed the dam and outlet works,
which would cost but $65,000, and reasonable diligence is shown by
a diligent prosecution of the condemnation of the dam site.

[1] Reported in 165 Pac. 495.

SAME. An appropriator of water was not guilty of want of reasonable diligence in the prosecution of proceedings to condemn a dam site and right of way, from the fact of a delay from May 29, 1911, to January 10, 1912, in entering judgment of condemnation, where that delay was consented to by the defendants so that time for an appeal would not commence to run, and much other delay was caused by legal proceedings by defendants' predecessors in interest, who appear to have been the real parties in interest when the consent was given.

EMINENT DOMAIN—FEASIBILITY OF PROJECT—JUDGMENT—CONCLUSIVENESS. In condemnation proceedings for an extensive irrigation project, the feasibility of the project is essentially in issue, and concluded by the judgment of condemnation.

Appeal from a judgment of the superior court for Grant county, Kauffman, J., entered August 16, 1915, in favor of the defendants, dismissing an action to quiet title, tried to the court. Affirmed.

*Cannon & Ferris* and *Williamson & Luhman* (*Mack F. Gose*, of counsel), for appellants.

*Merritt, Lantry & Merritt*, for respondents.

ELLIS, C. J.—In this action plaintiffs, claiming as *bona fide* subsequent appropriators, seek to quiet title to the waters of Moses lake, in Grant county, as against defendant's claim as a prior appropriator. For a description of Moses lake, its environs and outlet, we refer to the very full statement in the case of *State ex rel. Ham, Yearsley & Ryrie v. Superior Court*, 70 Wash. 442, 126 Pac. 945.

Defendant owns a large tract of land lying southwesterly and fourteen to twenty miles from the southerly end of the lake. This is semi-arid, but capable of being rendered very productive by irrigation. In the latter part of 1908, Wilbur S. Yearsley, vice president and treasurer of the defendant Ham, Yearsley & Ryrie, a corporation, conceived the idea of using the waters of the lake for irrigating these lands. Investigation was started, and it being determined that the water could be put on these lands by gravity, the first notice of the appropriation of the waters of the lake by defendant

was posted on January 20, 1909, and recorded on January 28th of that year. As investigation proceeded, subsequent notices were posted and recorded on February 8, 1909, and February 23, 1909; July 6, 1910, and July 8, 1910, respectively. Investigation was continued till, in August, 1910, defendant's officers were convinced that there was water available to irrigate about 30,000 acres of land. Touching the cost, defendant's engineer made different estimates, varying in amount according to the number of acres to be watered under the respective estimates. The plan was to store in the lake the annual runoff of water, place an intake pipe below the water level and conduct the water by gravity through thirteen or fourteen miles of open ditch, pipe and flume to defendant's lands. At the time of the trial in this case, the engineer had made an estimate for a final plan designed to irrigate 12,000 acres, the total cost of which would be $55 per acre, or $660,000. This plan called for the submersion of a six-foot intake pipe at an elevation of 1,032 above sea level, the water surface of the lake to be raised by a dam to an elevation of 1,038. By this plan the acreage could be increased to 20,000 without any additional cost per acre. Plaintiffs' experts placed the cost per acre much higher. For the purpose of securing the site for the dam, a condemnation action was commenced and a notice of *lis pendens* was filed on October 7, 1910. The suit was against the Northern Pacific Railway Company, the record owner of the land sought to be acquired, and R. F. Pettigrew, who held a contract of purchase from the railroad company.

On October 8, 1910, F. H. Nagle, manager of the corporations, plaintiffs in the case now before us, posted notices of appropriation of the waters of Moses lake with the professed intention of purchasing and irrigating lands around the lake and selling such lands with the water to settlers. For this purpose, plaintiff Grant Realty Company was organized in March, 1911. Nagle testified that the appropriation of

water and the work done by him was for the benefit of that company.

The condemnation action was tried in February, 1911, but the findings of fact and judgment entered thereon denying defendant's right to condemn were not filed until January 10, 1912. Honorable R. H. Steiner, the judge before whom it was tried, testified that he had no independent recollection as to when he announced his decision, but refreshing his memory from a book kept by the clerk, which was not introduced in evidence, he concluded that the decision was announced on May 29, 1911. G. M. Ferris, one of the attorneys for the railway company in the condemnation action and one of the attorneys for plaintiffs in the present case, testified that the reason that judgment was not entered until January 10, 1912, was that counsel for Ham, Yearsley & Ryrie requested of counsel for the railway company and Pettigrew "that judgment be not entered in order that his time for appeal might not start to run." No evidence was offered to the contrary.

Soon after the entry of that judgment, an application was made to this court for a writ of certiorari to review it. The writ was granted, and on October 10, 1912, an opinion of this court was filed reversing the action of the lower court and granting the right to condemn. *State ex rel. Ham, Yearsley & Ryrie v. Superior Court*, 70 Wash. 442, 126 Pac. 945. A petition for rehearing was filed and the remittitur was not sent down until March 10, 1913.

Meanwhile plaintiff in that suit, defendant here, continued its investigation as to the amount of water that would be available, and also constructed some of its ditch line. Yearsley, testifying from the books of defendant, stated that the amount expended in ditch construction was $6,123.33 since the condemnation action was commenced.

Turning now to the work done by plaintiffs, it was first actually started on March 26, 1911. Having become the owners of the land which defendant herein sought as a dam

site, plaintiffs constructed a dam thereon to impound the waters for their own project. The intention was to irrigate as much land as the water available would supply. This, based upon knowledge acquired up to the time of the trial herein, was estimated at approximately 15,000 acres. The plan was for the Grant Realty Company, with a capital of $3,000,000, to purchase the lands, secure the water rights and construct works. The land was to be divided into separate units, each to be irrigated by a separate pumping plant. Later the other plaintiff corporations, each with a capital of $1,000, were organized. To each of these subsidiary corporations was conveyed in return for its stock a tract of land forming a pumping or irrigation unit. These small corporations would sell the land to settlers and operate the plants. At the time of the trial, there were eight of these pumping units constructed capable of serving a total of 3,282 acres. Approximately 700 acres were receiving water. In this work there had been expended $226,000, exclusive of the cost price of the land, but including salaries of a manager, bookkeeper and stenographer amounting to $20,560, and traveling expenses amounting to $13,730.34.

Though the remittitur in the condemnation action was filed in the lower court on March 10, 1913, judgment of the trial court was not entered thereon until September 9, 1913. Defendant accounts for this delay by the statement that Grant county being a small county, one jury a year usually does the work. This is not denied, and Judge Steiner's testimony tends to confirm it. In any event, shortly after the entry of the judgment on September 9th, the case was noticed for trial and a jury demanded. On October 2, 1913, plaintiffs herein first made their appearance in the condemnation action. On that date they moved to be substituted as parties defendant instead of the railway company and Pettigrew, upon a showing that they had acquired title to the property sought to be condemned. This motion was denied. On October 14th, they moved for leave to file an answer and again

for substitution. These motions were also denied. On October 20th, they filed their answer and a motion to abate and vacate an order setting the condemnation action for trial. This answer was subsequently stricken and the motion denied. Thereafter plaintiffs herein applied to this court for a writ to prohibit the trial court from proceeding with the trial of the condemnation suit without making the requested substitution, whereupon the hearing in the condemnation suit was continued to December 1, 1913. The peremptory writ of prohibition was denied by this court in an opinion filed on November 7, 1913. *State ex rel. Grant Realty Co. v. Superior Court*, 76 Wash. 376, 136 Pac. 144. On November 21, 1913, plaintiffs made a joint motion to set aside the order theretofore entered striking their answer, to vacate the order of condemnation, to vacate the order fixing the date of trial, and to abate the action. On the same day, the complaint in the case at bar was filed, directly attacking the right of defendant herein to the waters of the lake. The trial court being of the opinion, as he testified, that the right to the waters of the lake should first be determined, thereafter treated the order setting the condemnation trial for December 1, 1913, as vacated. On April 29, 1914, on motion of plaintiffs herein, an order was entered in the condemnation case granting a stay of the action until the trial of the case at bar, and plaintiffs herein were given leave to subsequently apply for a vacation of the order of condemnation entered pursuant to the remittitur of this court. Thereafter the plaintiff in the condemnation suit, defendant here, applied to this court for a writ of mandamus to compel the trial court to proceed with the trial of the condemnation suit. On September 26, 1914, this court denied the peremptory writ, stating,

"That the learned superior court did not abuse its discretion in so controlling the order of the disposition of the two causes as to first cause the question of the right of the respective parties to the waters of Moses lake to be determined, in view of the possible influence that the disposition

of that question may have upon relator's [defendant's] right to acquire and hold the land by right of eminent domain." *State ex rel. Ham, Yearsley & Ryrie v. Superior Court,* 81 Wash. 690, 143 Pac. 310.

The case now before us was brought to trial, and on July 26, 1915, a decree was entered adjudging to defendant the prior right to appropriate the waters of the lake, and dismissing plaintiffs' complaint with costs. Plaintiffs appeal.

Appellants contend (1) that respondent has not prosecuted its project in good faith, but merely as a speculation, and (2) that respondent, by lack of diligence, has lost its right to claim a priority of water right by relation under the statute, Rem. Code, §§ 6318 and 6319, as against appellants, who are subsequent appropriators of the waters of the lake.

I.   We shall devote little space to the question of good faith. Every extensive irrigation project is, in a sense, essentially speculative. So far as the record shows, respondent's project is not more inherently speculative in its nature than that of appellants. Yearsley testified in substance that, in the spring and summer of 1910, he entered into negotiations with Pettigrew and the Armours, of Chicago, with a view to uniting Pettigrew's and respondent's interests and a financing of the project by the Armours; that, through the influence of Brumder Brothers, of Milwaukee, the Armours were dissuaded from taking any interest in the matter; that he then attempted to interest the Brumders in respondent's project, but they gave him to understand that they had plenty of money and would proceed with their own project regardless of respondent's claims, whereupon respondent commenced the action to condemn for a dam and intake site. It is true that Yearsley testified that, when he was negotiating with the Armours, he supposed he was selling out; but from the entire evidence we are satisfied that he did not mean this literally, but in the arrangement as then contemplated, he and his associates expected to retain an interest. At any rate, all this was before the appellant corporations had been

launched by the Brumders, and this court subsequently (70 Wash. 442) ordered the entry of a judgment permitting a condemnation as against the railway company and Pettigrew, under whom appellants claim title to the land subject to the condemnation suit. Obviously the question of respondent's good faith up to that time was foreclosed as to Pettigrew and the railway company in that proceeding, and also as to appellants, who claim title to the land under those parties. It is true appellants claim title to the water of the lake by an independent appropriation, but that can make no difference. The question of respondent's good faith was as essentially involved in the condemnation suit as it is in this suit and was, or should have been, litigated in that suit.

II.   The statute of this state governing the appropriation of waters is founded upon the Arid Region Doctrine of appropriation as distinguished from the common law rule of riparian rights. That doctrine is based upon the custom of miners in the early days in California, under which the first taker of water on public lands for a beneficial use was accorded the better right. Under that rule the completed diversion, if diligently accomplished, related back to the initial work so as to cut out intervening claimants. Statutes such as ours are, in the main, but declaratory of this Arid Region Doctrine with the added requirement of an initial statutory notice, to the date of which the appropriator's rights shall relate on condition that he commence work within a given time and prosecute it diligently and continuously to completion and apply the water to a beneficial use. Our statute, reference being to Rem. Code, provides, in § 6316, that "as between appropriations, the first in time is the first in right." In § 6317, it prescribes the character of the notice and provides for posting and filing the same. It then provides:

"Sec. 6318.   If said use is by storage, the appropriator must, within three months after the notice is posted, commence the construction of the works by which it is intended to store the same. If said use is by diversion, the appro-

priator must, within six months after the notice is posted, commence the excavation or construction of the works by which it is intended to divert the same; it being herein expressly provided that such works must be diligently and continuously prosecuted to completion, unless temporarily interrupted by the elements."

"Sec. 6319.  By a strict compliance to the above rules the appropriator's rights to the use of the water actually stored or diverted relates back to the time the notice was posted; but a failure to comply therewith deprives the appropriator of the right to the use of the water as against a subsequent appropriator who faithfully complies with the same."

It is manifest, both from the custom which is its basis and from the terms of the statute, that a claimant can invoke the rule of relation declared in § 6319 only by a compliance with the rule of diligence laid down in § 6318.  What constitutes a sufficient compliance with that rule of diligence is the dominant question in this case.  Appellants contend that the diligent and continuous performance of the actual physical work of construction and diversion to completion is a *sine qua non*, evitable only by the statutory excuse of temporary interruption by the elements.  Respondent urges that delays in the actual work occasioned by litigation, especially if waged with the adverse claimant, must be excused.  It seems to us that neither position is wholly correct.  The first is too narrow; the second too broad.

It has usually been held that any matters not incidental to the enterprise itself, but rather personal to the appropriator, such as pecuniary inability, sickness and the like, are not circumstances excusing great delay in the construction of the works necessary to actual diversion and use of the water.  *Ophir Silver Min. Co. v. Carpenter*, 4 Nev. 534, 97 Am. Dec. 550; *Rio Puerco Irr. Co. v. Jastro*, 19 N. M. 149, 141 Pac. 874; 2 Kinney, Irrigation & Water Rights (2d ed.), § 739; 1 Wiel, Water Rights (3d ed.), § 383.  From an assumed analogy, appellants argue that litigation is never an excuse.  But to create the analogy it must be assumed

that all litigation is purely personal to the litigant.   The assumption is faulty.   Condemnation for a site for an impounding dam or intake by an appropriator who does not own such a site is just as much matter incident to the enterprise to which the dam or intake is an essential as is the actual construction of the dam or intake.   It would be simply idle to confer, as our statute does confer, upon the owner of nonriparian lands the right to condemn for such purpose if the time necessarily consumed in the condemnation must be entered in red on the ledger of diligence and thus defeat his right of priority by relation, which the statute as a whole was intended to give.   If time necessarily consumed in condemnation must be charged as time lost through lack of diligence under the statute, then every enterprise in which the condemnation of a site for diversion works is necessary is a defeated enterprise at its inception, and the statutory right to condemn is not a right but a snare.   The right to condemn is dependent upon the initiation of the right to use the water by valid notice of appropriation, since it is an incident to the diversion of the water.   Whatever the general rule, such is the law of this case as declared by this court on the original review.   70 Wash. 442, 126 Pac. 945.   It is there said:

"The relator's right to acquire this land by condemnation rests upon its right to the water which it proposes to use in its irrigation project.   That is, if it has lawfully acquired by appropriation the right to so use the water, it then has the right to acquire the land by condemnation in aid of its irrigation project.   Otherwise it has no such right to so acquire the land, since its public use of the land rests upon its ability to use it as a part of its irrigation works, and, of course, it can have no irrigation works if it has no water therefor."

It follows that the prosecution of the condemnation proceeding is a necessary part of the prosecution of the work to completion in order to enable respondent to invoke the doctrine of relation.   It follows further that, if respondent has prosecuted the condemnation for its dam site "diligently and

continuously," the time so consumed must be considered as employed in construction work. In the nature of the case, it is time just as necessary to the work of impounding and diversion as is the time necessary for the actual physical construction of the dam. The condemnation suit, therefore, is not matter of excuse from performance of the work, but is itself matter of performance. Any other view would make it virtually impossible for any one but a proprietor of riparian lands to secure water for irrigation by the doctrine of relation, as against a subsequent appropriator who actually takes the water pending suit to condemn a site for a dam or intake by the appropriator who first initiated his right by valid statutory notice. If the rule contended for by appellant is correct, then all that a riparian owner, whose property includes the only feasible site for diversion, would have to do would be to ignore the nonriparian first appropriator's notice of appropriation and divert and use the water while the first appropriator was prosecuting his action to condemn the site for diversion. Such a construction would make the statute defeat itself.

But appellants argue that respondent is trying to occupy two inconsistent positions; first, that the right to condemn exists because of the initiated water right; and second, that the water right is perfected by the exercise of the right to condemn. We fail to see the inconsistency. Under the statute, the right to take the water, as against a subsequent appropriator, does depend in terms upon the initial notice of appropriation through the rule of relation. That is to say, the actual taking relates back to the original notice so as to defeat intervening appropriations of the same water. Such is the express declaration of the statute. Section 6319. If, therefore, the prime physical essential for the taking, namely, a site for diversion works, can only be acquired by condemnation, the final perfection of the water right so as to attach by relation as of the date of its initiation is essentially and necessarily dependent on the exercise of the right to condemn.

This is not only a self-evident fact, but it is recognized by another section of the statute itself, § 6329, which gives to the owner of nonriparian land the right to condemn for right of way for any ditches, canals and works necessary to divert and convey the water to his lands. It must not be forgotten that the very purpose of the statute is to abolish the doctrine of riparian rights by giving effect to the doctrine of relation through diligence in construction in favor of the owner of nonriparian land as well as the owner of riparian land. Equality of rights can only be attained by an equality of means. When this fact is clearly grasped, the two propositions, that the right to condemn exists because of the initiated water right, and that the water right is perfected through the exercise of the right to condemn, are plainly not only perfectly consistent, but their existence in correlation is inevitable in every case where condemnation is necessary to the completion of the enterprise.

It may be conceded, as urged by appellants, that the statute of relation imposes upon the courts its own rule of strict construction. But even a strict construction must be a reasonable construction. It is elementary that statutes *in pari materia* must be construed together. So construing the statute of relation, §§ 6318 and 6319, and the statute giving the right of condemnation, § 6329, no construction can be reasonable which would make the provisions of the one defeat those of the other. In every view of the matter, therefore, time reasonably consumed in the condemnation must be construed as time necessarily consumed in the performance of the work of construction, hence not delay to be excused by a showing of interruption by the elements or otherwise.

It is also urged that to excuse the delay caused by the condemnation suit, though that delay may have been largely occasioned by appellants' intrusion into the litigation, would be to penalize appellants for asserting their legal rights in a lawful way. It is true, as persuasively argued by appellants,

that a landowner whose land is sought to be taken by condemnation has a perfect right, both legal and moral, to resist such condemnation in the courts, and that such resistance is not to be classed in the category of wrongful physical resistance or unlawful obstruction. But the only legitimate purpose of such resistance in the courts is to *prevent* the taking of his land—not merely to *delay* that taking. It follows, therefore, that, if he ultimately fail to defeat the right to condemn, he cannot claim any advantage from the delay occasioned by his attempt. He cannot defeat the condemnation on the ground of such delay and thus rob his adversary of an established right. So long as the condemnation suit is prosecuted with reasonable diligence, then, however long it may take to complete the condemnation, the rights of the parties to the water must be measured as of the date when the condemner posted and filed his notice of appropriation else the doctrine of relation can never exist where condemnation is necessary.

While we have been cited to no decision and have found none on a statute and facts exactly parallel with those here presented, we have, by independent search, found two decisions which in principle seem to us to support the views here expressed. The present water code of Oregon provides for a change from the old form of procedure to a new and different method of initiating water rights, but it saves to persons or corporations whose appropriations had been initiated under the old law their rights as prior appropriators on condition that they, in compliance with the old law, "commence the construction of works for the application of the water so appropriated to a beneficial use, and thereafter prosecute such work diligently and continuously to completion." A corporation so claiming under the old law was charged with abandonment for lack of such diligent and continuous prosecution. The delay was caused by litigation and efforts to secure a right of way and reservoir site. The court said:

"A delay caused by litigation and efforts by an irrigation company to obtain a right of way for irrigation ditches and reservoirs is not a ground for forfeiture of its rights. *Pringle Falls Power Co. v. Patterson,* 65 Ore. 474, 128 Pac. 820, 132 Pac. 527. Such proceedings, instead of showing an abandonment, indicate that the company is fighting for the purpose of carrying forward the project." *In re Willow Creek,* 74 Ore. 592, 144 Pac. 505, 146 Pac. 475.

Obviously the court, without saying so *in haec verba,* did in effect construe litigation necessarily incident to the prosecution of the enterprise as a part of the construction work which the statute expressly said should be "prosecuted . . . diligently and continuously to completion." It treated the delay so occasioned as a thing sufficiently accounted for rather than a thing to be excused.

The other case involved the question of diligence under a statute of California which provided that, within sixty days after posting his notice, the claimant of a water appropriation must commence construction of the diversion works and must prosecute the work diligently and uninterruptedly, and that, by a compliance with those provisions, the claimant's right to the use of the water relates to the time of posting the notice. The claimant in that case posted notices of appropriation of water flowing from certain abandoned artesian wells on public land and commenced to construct ditches for diversion within sixty days, but was enjoined from entering on the lands for further work by a homesteader who had located on the land shortly after the posting of the notices of appropriation. The water claimant brought an action to establish her right to the water. She was defeated and appealed. The decision of the trial court was reversed. Touching this interruption in the work, the appellate court said:

"Having capped the wells, and enjoined appellant from entering upon the land to complete the ditch, by means of which she sought to divert the water to the place of intended use, respondents are in no position to assert that appellant has failed to prosecute the work with diligence and become

an actual appropriator." *De Wolfskill v. Smith*, 5 Cal. App. 175, 89 Pac. 1001.

While that decision apparently rests on the ground of estoppel, it is clear authority for our view that, though a subsequent appropriator has a perfect right to defend his possession in the courts, the only legitimate purpose of his defense is to defeat the prior claimant's right, not merely to delay its consummation, and that any delay caused by such litigation cannot be asserted as lack of diligence or otherwise, as against the prior appropriator, so as to defeat his right to claim priority by relation.

The further claim that respondent has lost its water right by the failure to complete all of its project except the dam pending the litigation is not tenable under the evidence. The dam and outlet works will cost about $65,000; the ditches, flumes and pipe lines about $595,000. The interest on that sum since the commencement of the condemnation suit, October 7, 1910, at 4 per cent, to this time would amount to nearly $150,000. This all to no purpose, since the line must have lain idle till the dam site could be secured, and the ditches, flumes and wooden pipes without water would have probably so deteriorated as to require a practical reconstruction when the dam site shall be secured. The law of diligence is not a rule of unreason and waste.

The question of diligence, as it seems to us, is thus reduced to the inquiry whether or not the condemnation suit has been prosecuted with reasonable diligence under all the attendant circumstances. A detailed discussion of the record and evidence on this question would unduly extend this opinion, already too long. Most of the delays are accounted for by the three resorts to this court on different phases of the litigation, and by the fact that there is only one jury term a year in Grant county, where the suit is pending. We are satisfied that there has been no culpable delay in the prosecution, unless it be respondent's failure to have judgment entered on the trial court's original decision of May 29, 1911, earlier

than January 10, 1912.   That delay, however, as proven by appellants themselves, was consented to at the time by their predecessors in interest.   Had that consent been withheld, we must assume that the judgment would have been entered promptly on the court's decision.   By their consent appellants' predecessors would certainly be estopped to claim any advantage from that delay.   Because of their privity in title, appellants should be held equally estopped.   Indeed, the record furnishes reason to believe that even then appellants' promoters, the Brumders, were the real parties in interest.

Finally, appellants contend that, in any event, respondents' project is not feasible.   That question, however, was essentially in issue when the order for condemnation was entered in the original suit.   We then held that there was a sufficient showing of feasibility.   True, we said that "the only unsolved problem seems to be as to the amount of water that can be so accumulated and stored."   70 Wash. 459.   But we were nevertheless then satisfied that there was "little doubt of the practicability of relator's project."   The evidence now before us upon this question is extremely conflicting.   Assuming it still an open question, we are not convinced that the project is not feasible for the irrigation of about 12,000 acres.

The decree is affirmed.

HOLCOMB, MOUNT, MAIN, PARKER, FULLERTON, CHADWICK, and MORRIS, JJ., concur.

WEBSTER, J., took no part.